IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                         Criminal Action No. 2:11-CR-16-11
                                           JUDGE BAILEY

LESLIE DOMINIC MUSGROVE,

       Defendant.

**SEALED[1] REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY DEFENDANT'S MOTION TO SUPPRESS [114] AND DENY DEFENDANT'S MOTION TO DISMISS INDICTMENT [115]**

## INTRODUCTION

Pending before the Court are Defendant Leslie Dominic Musgrove's Motion to Suppress (ECF No. 114) and Motion to Dismiss (ECF No. 115), filed on July 22, 2011. On August 9, 2011, the Court held an evidentiary hearing on the Defendant's motions. The Defendant, Leslie Dominic Musgrove, appeared in person and by counsel, William M. Gruel, Esq., the Government appeared by counsel Erin K. Reisenweber, Assistant United States Attorney, and testimony was taken from Trooper First Class D. Scott See of the West Virginia State Police Bureau of Criminal

---

[1] By order dated July 27, 2011, and signed by the Hon. John Preston Bailey, United States District Judge, a Protective Order (ECF No. 120) was entered in this case allowing the Government to provide limited disclosure of certain sealed documents relating to the substance of the Defendant's motions; namely, the search warrants, applications, and affidavits supporting the warrants. Because this Report and Recommendation contains substantial information, including quoted information, taken from these sealed documents, this Court **ORDERS** that this Report and Recommendation be entered under seal and disclosed only in accordance with the Protective Order in force in this case.

Investigations. After considering the briefs and evidence offered by the parties, the undersigned Magistrate Judge now issues this Report and Recommendation, recommending that the District Court deny Defendant's Motion to Suppress Physical Evidence and deny Defendant's Motion to Dismiss Indictment. The reasons for recommending denial are set forth below.

## PROCEDURAL BACKGROUND

The Defendant, Leslie Dominic Musgrove, is one of twelve defendants named in this case as alleged co-conspirators in a major cocaine hydrochloride and methamphetamine distribution ring. The charges in this case are the result of a five-month investigation conducted by the West Virginia Bureau of Investigation's Potomac Highlands Drug and Violent Crimes Task Force, which investigated the interstate trafficking and distribution of large quantities of cocaine hydrochloride and methamphetamine by members of the Mexican drug cartel.

The Defendant was originally charged on April 11, 2011, via criminal complaint with one count of aiding and abetting the distribution of one ounce of methamphetamine after a confidential informant ("CI") arranged a controlled purchase through the Defendant. Complaint, United States v. Musgrove, No. 2:11-MJ-12, ECF No. 1 (N.D.W.Va. April 11, 2011). The Defendant appeared on April 12, 2011, and on April 15, 2011, this Court found the Defendant to be ineligible for bond and ordered him detained because he was subject to a detainer for violating the conditions of his probation in the State of West Virginia. Order of Temporary Detention, United States v. Musgrove, No. 2:11-MJ-12, ECF No. 13 (N.D.W.Va. April 15, 2011). On April 25, 2011, the Defendant filed a second motion for bond, which was denied on April 27, 2011, by this Court without prejudice, with leave to re-file at such time as the Defendant's state charges are resolved. Second Motion for Bond, United States v. Musgrove, No. 2:11-MJ-12, ECF No. 15 (N.D.W.Va. April 25, 2011); Order

Denying Motion, United States v. Musgrove, 2:11-MJ-12, ECF No. 16 (N.D.W.Va. April 27, 2011).

The Defendant was subsequently indicted on May 3, 2011, and charged with one count of distribution of five or more grams of methamphetamine. Indictment, United States v. Musgrove, No. 2:11-CR-15, ECF No. 17 (N.D.W.Va. May 3, 2011). On June 17, 2011, the Defendant filed a pro se motion for a bond hearing and the Defendant's counsel also filed a motion for a bond hearing, both of which were denied by the Hon. John Preston Bailey, United States District Judge, on April 21, 2011. Pro Se Motion for Bond Hearing, United States v. Musgrove, No. 2:11-CR-15, ECF No. 27 (N.D.W.Va. June 17, 2011); Second Motion for Bond Hearing, United States v. Musgrove, No. 2:11-CR-15, ECF No. 28 (N.D.W.Va. June 17, 2011); Order Denying Motions, United States v. Musgrove, No. 2:11-CR-15, ECF No. 29 (N.D.W.Va. June 21, 2011).

On June 21, 2011, the Defendant, along with eleven other co-defendants identified during the course of the Government's investigation, was charged in a superseding indictment with conspiracy to distribute cocaine hydrochloride and methamphetamine, aiding and abetting the distribution of cocaine hydrochloride, and aiding and abetting the distribution of methamphetamine. (Superseding Indictment, ECF No. 82) On July 7, 2011, this Court entered a new order detaining the Defendant, finding the Defendant ineligible for bond based upon the detainer lodged against him by the State of West Virginia for violating his probation. (Order of Temporary Detention, ECF No. 95)[2] On August 2, 2011, the Government filed a motion for a detention hearing, asking this Court to examine the merits of the Defendant's request for a bond. (Motion for Detention Hearing, ECF

---

[2] An interlocutory appeal of this order was filed with the Fourth Circuit Court of Appeals. (See Notice of Appeal, United States v. Hernandez et al, ECF No. 125; USCA Notice of Appellage Case Opening, ECF No. 129) See also United States v. Leslie Musgrove, No. 11-4761 (4th Cir. 2011). On August 12, 2011, the Fourth Circuit denied the Defendant's appeal as moot. (Order of USCA, ECF No. 147)

No. 128) Finding good cause, this Court granted the Government's motion and held a bond hearing in this case on August 9, 2011. (Paperless Order, ECF No. 131) Also on August 9, 2011, this Court held an evidentiary hearing on the Defendant's motions to suppress evidence and dismiss indictment. On August 11, 2011, the Government filed a supplemental response to the Defendant's motion to dismiss. (Supplemental Response, ECF No. 146)

## FINDINGS OF FACT

As part of a larger investigation of a conspiracy to distribute cocaine hydrochloride and methamphetamine, members of the Eastern Panhandle Drug and Violent Crimes Task Force executed a search warrant at defendant Leslie Musgrove's residence at 139 Huttons Vireo Drive, Berkeley County, West Virginia. The search warrant application was supported by an affidavit sworn by Trooper First Classs D. Scott See of the West Virginia State Police Bureau of Criminal Investigations. The search warrant affidavit sworn by Trooper See contained the following information pertaining to defendant Leslie Musgrove, located at paragraphs 1, 2, 19, 20, 24-26, 33, and 35-37:

1. On November 27, 2010, in the evening hours, Tfc. D.G. Lahman arrested Danielle Corbin subsequent to a traffic stop on SR 48/55 near Moorefield, WV in Hardy County. Corbin was found to be in possession of approximately one kilo of cocaine hcl located within the trunk of her vehicle.

2. On December 20, 2010, Cpl. Bean debriefed Danielle Corbin at the law office of Kevin Mills. During this debriefing it was learned that Corbin was transporting the kilo of cocaine hcl to Moorefield, WV where she would meet an unknown individual(s) in the parking lot of the Walmart department store. Upon making contact, they would travel to a more discrete location where Corbin would make the exchange. Corbin advised this trip was one of several trips she had made, however, her first to Moorefield. She further advised she had been paid $500.00 to make the trip from Leslie Musgrove. Corbin advised she met Musgrove in the club and had an intimate relationship with him. It was further learned that Corbin had made trips to an area in Front Royal, Va. to obtain narcotics from unknown Mexican suppliers.

19. On February 10, 2011, Tfc. See and Cpl. Johnson debriefed CI 338-10-010 at the Moorefield/Petersburg Detachment of the West Virginia State Police. During this debriefing, the CI advised his/her drug source was Leslie Musgrove. The CI further advised Musgrove would arrange the "drops" and that he/she had picked up large quantities of narcotics from Musgrove's residence on several occasions. The CI said often Musgrove would leave the garage door to his residence open and the CI would pull into the driveway and load the narcotics into his/her vehicle. The CI stated all the times he/she would "pick up" narcotics he/she was getting them from Leslie Musgrove.

    The CI advised around January 31, 2010 he/she spoke to Musgrove in regard to a female who was delivering a kilo of cocaine to Moorefield, WV. The CI said Musgrove called him and said he was sending some stuff up here to some guys and it got popped. Musgrove further informed the CI that he believes the girl told the police about him. The CI stated he/she knew that the cocaine the girl was delivering was going to the Mexicans who own the sores because Musgrove owes them a great deal of money. The CI told investigators that after he/she got arrested, Musgrove and a bunch of Mexicans came to his house and had his girlfriend, Maggie Akers, take them to the storage rental and took the methamphetamine and marijuana that was missed during the execution of the search warrants.

20. On February 12, 2011, Tfc. See was contacted by CI 338-10-010 via text message. The CI stated Leslie Musgrove had just called him/her from a restricted number. The CI informed Musgrove that he/she may have something for him (referring to money) in a couple of days. The CI advised Musgrove told him/her that he would call the CI tomorrow (2/13/11).

24. On February 18, 2011, Tfc. See was contacted by CI 338-10-010 and advised he/she had just received a telephone call from Leslie Musgrove. The CI further advised Musgrove informed him/her that he was going to try and "get something going" this weekend and that Musgrove would call him/her later this weekend.

25. On February 22, 2011, Tfc. See was contacted by CI 338-10-010 via text message. The CI was advising he/she had just been contacted by Leslie Musgrove. Musgrove asked the CI if he/she could get "anything down" on something. The CI further advised Musgrove told him/her he had a couple big things but the CI wasn't exactly clear on what Musgrove was referring to, but he/she believed Musgrove was talking about a "kilo" of cocaine. Musgrove informed the CI he would call him/her at a later time. At approximately 1640 hours, the CI attempted to contact Musgrove with the call going unanswered. The CI immediately attempted to call back Musgrove and the call was answered by Musgrove. The CI was attempting to arrange a controlled meeting between him/her and Musgrove for the purpose of purchasing a smaller amount of cocaine hcl or marijuana. Musgrove asked the CI if he/she would be able to get some cash together and further stated he should be able to arrange a purchase

by the end of the week. Musgrove indicated he did not wish to talk much on the telephone and that he would call the CI at a later time.

26. At approximately 1941 hours [on February 25, 2011], Tfc. See was contacted by CI 338-10-010 via text message. The CI advised he/she had just received a telephone call from Leslie Musgrove from the cellular telephone number (304) 707-4825. Musgrove told the CI he wanted him/her to go meet the Mexians in Moorefield and pick up four (4) ounces of something. The CI believed Musgrove was referring to methamphetamine.

At approximately 1945 hours, Tfc. See received another text message from the CI indicating Musgrove had again called the CI and informed him/her that it would cost $1300.00 an ounce. The CI stated he/she told Musgrove that it would be difficult for him/her to be able to find that much money on short notice but thought he/she would be able to get a smaller amount. Musgrove informed him/her to go to the Mexican restaurant on the south end of Moorefield and meet a Hispanic male in a green Ford Explorer.

At approximately 2040 hours, Cpl. Johnson met with CI 338-10-010 at a predetermined location to conduct a controlled telephone call to Musgrove. Cpl. Johnson issued the CI $1,300.00 in US currency to be used to make the purchase.

At approximately 2050 hours, the CI traveled to the restaurant and obtained a plastic bag containing what was represented to be one (1) ounce of suspected methamphetamine from the driver's seat of the green Ford Explorer bearing WV registration 3NJ759. Investigators observed Juan "Bionic" (LNU) driving this vehicle earlier this date. The CI placed the $1300.00 previously issued to him/her by Cpl. Johnson on the seat of the vehicle as instructed to do by Musgrove. The CI then departed and met investigators at a predetermined location.

33. On March 10, 2011, Tfc. See was contacted by CI 338-10-010 via text message. The CI indicated he/she had just been contacted by Leslie Musgrove who advised "it" (drugs) should be in this weekend and that Musgrove also stated something about his guys getting stopped on I81 in a road check but nothing was found. The CI advised he/she did not know what type of drugs would be available just that Musgrove stated everything should be good this weekend.

35. Investigators were also conducting surveillance [on March 11, 2011] on the residence located at 160 Wiltshire Circle and while doing so, observed Leslie Musgrove and several Hispanic males present at this location. Musgrove was operating his blue Nissan Armada. Investigators observed the silver Dodge Ram bearing WV 7TE254, a green Ford Explorer bearing WV 3NJ759 being operated by Juan "Bionic" (LNU), and an older model Chevrolet truck present at this residence.

36. On March 15, 2011, Tfc. See contacted CI 338-10-010 via text message. Tfc. See asked the CI if he/she had heard from Leslie Musgrove. The CI returned the message and stated he/she had just talked to him and then contacted Tfc. See via cellular telephone. The CI stated Musgrove told him he had something big and that he would be able to do something on Wednesday (3/16/11) or Thursday (3/17/11) The CI believed Musgrove had a pound of methamphetamine but wasn't for sure. The CI further advised he/she did not know if he/she would be dealing directly with Musgrove because Musgrove told him/her that he wouldn't have to travel very far.

37. On March 21, 2011, at approximately 1320 hours, Tfc. See was contacted by CI 338-10-010 via text message. The CI advised he/she had spoken to Leslie Musgrove by cellular telephone. Musgrove informed the CI that his guys keep messing around with him but he was pretty sure he was going to see them today. The CI told Musgrove he/she would be good on Tuesday 3/22/2011. Musgrove told the CI he would call him/her later this date or tomorrow (3/22/11). Musgrove told the CI he would try and front him/her at least a half of a pound of methamphetamine.

On April 9, 2011, at approximately 6:21 PM, this Court, based upon the facts above, issued a search warrant for the search of Leslie Musgrove's residence at 139 Huttons Vireo Drive in Berkeley County, West Virginia, which was executed that evening at approximately 10:32 PM. The search warrant authorized the search to be conducted at any time of the day or night.

## CONTENTIONS OF THE PARTIES

1. <u>Defendant's Motion to Suppress</u>

The Defendant seeks to suppress all evidence obtained during the search of his residence on April 9, 2011. The Defendant contends that the search warrant relied improperly upon the information of an informant and not upon facts known to the officer who filed the affidavit. The Defendant also contends Federal Rule of Criminal Procedure 41(e)(2)(A)(ii) was violated because the warrant was executed at night.

In regard to the validity of the search warrant, the Government responds to the Defendant's motion by arguing that the totality of the circumstances established probable cause to search the Defendant's residence. The CI provided information directly to the affiant and was actually able

to purchase an ounce of methamphetamine in a deal arranged by the Defendant. The informant also advised the officers that he had made narcotics pickups from the Defendant's residence in the past. As far as the timing of the search warrant's execution, the Government points to the fact that Title 21, United States Code, Section 879 allows for the execution of search warrants at night in cases involving controlled substances.

2.  Defendant's Motion to Dismiss

The Defendant argues that the indictment against him should be dismissed because his Due Process and Sixth Amendment rights have been violated. First, the Defendant argues that this Court, by finding him ineligible for bond and denying his motions for a bond hearing, has violated the Bail Reform Act and thereby violated the Defendant's Due Process right to a reasonable bail. Second, the Defendant argues that the Government, by dismissing the original indictment and recharging the Defendant in a superseding indictment, has violated the Speedy Trial Act by failing to bring him before the Court for trial within 70 days of his appearance on the original charge. The Defendant believes that the Government has abused the indictment process in order to extend the time of his pre-trial detention and to gain a tactical advantage in developing its case

In response, the Government does not directly address the Defendant's Due Process allegations, addressing instead the merits of the Defendant's detention status and arguing that he has failed to present evidence to rebut the presumption of detention in his case. The Government devotes most of its response to the Defendant's speedy trial claims, arguing that the Defendant's Speedy Trial Act clock reset when he was charged in the superseding indictment and that his new speedy trial clock has yet to begin to run because other co-defendants in his case have not yet appeared. The Government further argues that the superseding indictment in this case was a good

faith procedural move to add new defendants and charges and that the original complaint and indictment were only filed due to emergency circumstances stemming from the shooting of a police officer involved in investigating the case. Additionally, the Government's supplemental response provides a lengthy calculation of the Defendant's speedy trial clock showing that even if the original clock was still applicable the multitude of motions and the interlocutory appeal in this matter tolled the clock sufficiently to place the Defendant within the 70 day window on the original offense.

**DISCUSSION**

1. <u>The Defendant's Motion To Suppress Should Be Denied Because There Was Probable Cause To Search The Defendant's Home And The Search Warrant Was Properly Executed</u>

    A. <u>The Search Warrant Executed At The Defendant's Home On April 9, 2011 Was Supported By Probable Cause Because The Confidential Informant Had Provided Other Reliable Information In Regard To The Defendant's Drug Activities</u>

As his first ground for suppression, the Defendant contends that the officers lacked probable cause to obtain a search warrant for his home because the search warrant affidavit improperly relied solely upon information provided by a confidential informant. The Defendant's argument fails because probable cause can be established from the information of an informant if that information is reasonably trustworthy and the informant in this particular case provided reliable information to investigators prior to the issuance of the search warrant.

Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). In determining whether probable cause exists, the Court must base its conclusion solely on the facts and circumstances presented in the affidavit when the search warrant application was made. <u>United States v. Rios</u>, 611 F.2d 1335, 1347 (10th Cir. 1979). If probable cause is based upon information provided by an informant, the reliability of that informant is assessed using a "totality of the circumstances" test. <u>Illinois v. Gates</u>,

462 U.S. 213. 233-38 (1983). An informant's truthfulness and reliability, while certainly relevant, are only two factors among many that courts may consider; a very detailed tip, for example, may compensate for questions about the informant's reliability, and a tip that relies on hearsay may be deemed reliable if police later can corroborate it. United States v. White, 549 F.3d 946, 950 (4th Cir. 2008) (citing Gates, 462 U.S. at 241-42 (1983)).

A magistrate judge's "determination of probable cause should be paid great deference by reviewing courts." Id. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). In marginal cases, deference is given to the prior determination of probable cause made by the issuing authority. Spinelli, 393 U.S. at 419.

In this case, the information provided by the CI was reliable because some of the information was corroborated by statements from other witnesses or by events within the direct knowledge of the investigating officers. First, on January 31, 2010, the CI informed Trooper See that he had spoken with the Defendant about a female who was arrested while attempting to deliver a kilo of cocaine for him. This information was already known by the investigating officers, who had debriefed the female in question – Danielle Corbin – and learned that she had been paid $500.00 to transport the cocaine to Moorefield. Second, the CI advised the officers about a drug deal that the Defendant set up for him on February 25, 2011, in which the Defendant instructed the CI to travel to a Mexican restaurant on the south end of Moorefield, West Virginia, to meet a Hispanic male in a green Ford Explorer. Earlier that day, investigators had observed Juan "Bionic" (LNU), an indicted co-defendant in this case, driving the green Ford Explorer described in the CI's tip, and the Defendant was later observed on March 11, 2011, at a residence where this same green Ford Explorer was parked. Furthermore, the CI was actually able to complete the drug transaction,

exchanging $1300.00 for one ounce of methamphetamine that had been left in the vehicle for the CI to pick up. Considering that all of the above information was corroborated by information known to the investigating officers, the totality of the circumstances supported the reliability of the CI's additional statements that he had previously picked up narcotics from the Defendant's home. Accordingly, probable cause existed at the time the search warrant was issued to search the residence of the Defendant for evidence of narcotics trafficking.

      B.      <u>The Search Warrant Was Properly Executed Because Both The Warrant And Federal Law Authorized The Officers To Execute The Warrant At Nighttime</u>

The Defendant's second ground for suppression is that the search warrant was executed at night in violation of Rule 41 of the Federal Rules of Criminal Procedure. The Defendant's argument fails because the search warrant specifically authorizes a search at night and, in this case, the provisions of Rule 41(e) are superseded by Title 21, United States Code, Section 879, which specifically allows for search warrants to be served at any time of the day or night if the warrant is related to an offense involving controlled substances.

The Federal Rules of Criminal Procedure ordinarily require officers executing a search warrant to "execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time." FED. R. CRIM. P. 41(e)(2)(A)(ii). However, "[a] search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or United States magistrate judge issuing the warrant is satisfied there is probable cause to believe that grounds exist for the warrant and for its service at such time." 18 U.S.C. § 879 (2011). Thus, "when a search warrant involves violations of drug crimes, the warrant can be served day or night so long as the warrant *itself* is supported by probable cause." <u>United States v. Rizzi</u>, 434 F.3d 669, 674 (4th Cir. 2006). To the extent that Section 879 might conflict with

the good cause requirement of Rule 41(e), the Fourth Circuit has held that Section 879 applies exclusively. See Id.

This Court found probable cause to issue a search warrant for the Defendant's residence, and that warrant specifically authorized execution "at any time in the day or night as I find reasonable cause has been established." As discussed supra, the information forming the basis for the warrant was reliable. Considering that the warrant was approved at 6:21 PM and executed only a few hours later, this Court finds that no error was committed in executing the warrant.

2. The Defendants Motion To Dismiss Should Be Denied Because A Violation Of The Bail Reform Act's Prompt Hearing Provisions Is Harmless Error And No Speedy Trial Act Violation Has Occurred In This Case

    A. Any Violation Of The Bail Reform Act's Prompt Hearing Provisions That May Have Occurred In This Matter Is Harmless Error Because The Defendant Has Been Given A Detention Hearing And He Has Failed To Show That He Would Otherwise Have Been Entitled To Release Or That Pretrial Detention Has Prejudiced His Defense

As his first ground for dismissal of the indictment against him, the Defendant argues that his Due Process right to bond has been violated because this Court denied his motions for a bond hearing pursuant to the Bail Reform Act. Alternatively, the Defendant asks for a bond hearing and a reasonable bond in his case. Without addressing the merits of the Defendant's contention as to the application of the Bail Reform Act, this Court finds that dismissal of the indictment is inappropriate because any error that may have been committed was harmless and, in any event, the Defendant has been granted a bond hearing in this matter.

Title II, Section 203(a) of the Bail Reform Act of 1984, codified at Title 18, United States Code Section 3142, states that the judicial officer must hold a prompt hearing to determine bail:

    (f) Detention Hearing. – The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as

> required and the safety of any other person and the community . . . . The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance.

18 U.S.C. § 3142(f) (2008). However, failure to comply with the Bail Reform Act's prompt hearing provision does not require release of a person who should otherwise be detained. United States v. Montalvo-Murillo, 495 U.S. 711, 721 (1990). "Nonconstitutional error will be harmless unless the court concludes from the record as a whole that the error may have had a 'substantial influence' on the outcome of the proceeding." Id. (citing Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988)).

The United States Supreme Court has held that a violation of the Bail Reform Act's prompt hearing provisions amounts to harmless error if the Defendant would otherwise be detained. See United States v. Montalvo-Murillo, 495 U.S. 711, 721 (1990). In Montalvo-Murillo, the defendant, despite a finding by the district court that no conditions of release would assure the defendant's appearance or the safety of the community, was nonetheless ordered released because his detention hearing was not held upon his first appearance as specified by the Bail Reform Act. Id. at 716. The district court determined that pretrial release was the appropriate remedy for violation of the statutory timeliness requirement. Id. The Court of Appeals affirmed but the Supreme Court reversed, finding that the remedy granted – pretrial release – was inappropriate because releasing a defendant who should otherwise be detained contravenes the purpose of the statute to provide fair bail procedures while protecting the safety of the public and assuring the appearance of defendants found likely to flee. Id. at 720. In so finding, the Court stressed the fact that "[t]he safety of society does not become forfeit to the accident of noncompliance with statutory time limits where the Government is ready and able to come forward with the requisite showing to meet the burden of

proof required by the statute." Id. The Court also noted that it was unclear that the Government was responsible for the delay because the Magistrate sua sponte continued the defendant's hearing, but even if it should bear some of the responsibility it was inappropriate to "bestow upon the defendant a windfall and to visit upon the Government and the citizens a severe penalty by mandating release of possibly dangerous defendants every time some deviation from the strictures of § 3142(f) occurs."[3] The Court concluded by pointing out that its ruling was consistent with other case law finding harmless error when the record as a whole demonstrated that the error did not have a "substantial influence" on the outcome of the proceeding. See id. at 721; see also Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988) (nonconstitutional error is harmless unless it had a substantial influence on the outcome of the proceedings); United States v. Morrison, 449 U.S. 361, 364-67 (1981) (inappropriate to dismiss indictment because of Sixth Amendment violation that had no adverse impact on proceedings).

Applying the above principles to the present case, this Court finds that, even if the defendant was improperly denied a prompt hearing under the provisions of the Bail Reform Act, the Defendant lacks a remedy other than a detention hearing, which was provided by this Court on August 9, 2011. Regardless of the validity of the Defendant's Bail Reform Act claim,[4] the Defendant has been granted a detention hearing in this matter. At that detention hearing, the Government presented clear and convincing evidence that the statutory presumption of pretrial detention applies and that no

---

[3] The Court also noted the uncertainty involved in the defendant's detention status, including "whether the defendant was subject to temporary detention under § 3142(d)" – the statutory provision that was the subject of the Defendant's interlocutory appeal. See United States v. Montalvo-Murillo, 495 U.S. 711, 721 (1990).

[4] The Fourth Circuit Court of Appeals declined to address this issue in its order and this Court has already considered this issue in past orders, so no further analysis will be given here.

combination of conditions could reasonably ensure the appearance of the Defendant or the safety of the community. The Defendant failed to present evidence to rebut this presumption. As such, failure to comply with the timing provisions amounts to harmless error because the Defendant, had he received a detention hearing on the date of his initial appearance, would not have been released from custody. Furthermore, the Defendant has failed to present evidence to the Court that his defense has been prejudiced by his detention, that any delay in receiving a detention hearing affected the outcome of any of the proceedings in his case, or that the Government bears any responsibility for the alleged delay. This Court is mindful of the fact that dismissal of the indictment in this matter would provide a windfall to the Defendant and visit extreme hardship on both the Government and the public at large, and this Court declines to consider dismissal as a proper remedy for a violation of the Bail Reform Act.

  B. <u>The Speedy Trial Act Has Not Been Violated In This Case</u>

As his second ground for dismissal, the Defendant argues that his right to a speedy trial has been violated because he was not brought to trial within the seventy-day statutory time frame set forth in the Speedy Trial Act of 1974. The Defendant's argument fails because his speedy trial clock was reset upon being charged in the superseding indictment, his clock has yet to begin to run because other co-defendants have not yet been arrested and brought before the Court, and the Defendant has failed to present evidence showing that the Government acted in bad faith or intended to gain a tactical advantage by seeking a superseding indictment in this matter.

First, the Speedy Trial Act has not been violated in this case because the Defendant's speedy trial clock was reset upon being charged in the superseding indictment, and the speedy trial clock has not begun to run on the new charges due to the fact that other co-defendants have yet to appear

before the court. "[A] superseding indictment that adds either a new defendant or new charges restarts the speedy trial clock." United States v. Leszcynski, No. 02-4431, 2004 WL 144132, at *3 (4th Cir. Jan. 28, 2004). "[I]n cases involving multiple defendants only one speedy trial clock, beginning on the date of the commencement of the speedy trial clock of the most recently added defendant, need be calculated under 18 U.S.C. § 3161(h)(7)." United States v. Piteo, 726 F.2d 50, 52 (2nd Cir. 1983). "So long as the defendants in question are brought to trial within the seventy speedy trial days that began with the clock of the most recently added defendant and so long as any delay is 'reasonable,' the Speedy Trial Act is not violated." Id. The superseding indictment in this case adds new charges and new defendants, and as explained by the Government in its supplemental response, the need for the superseding indictment stems from the fact that investigators were "forced to obtain search warrants and arrest warrants earlier than anticipated when several of the named co-defendants were involved in the shooting of a law enforcement officer in Arizona." (Supplemental Response 7, ECF No. 146) As a result, the Government "was not prepared to present all possible counts for Indictment during the may Grand Jury session. It was not until the June session in Elkins that the United States was ready to proceed." (Supplemental Response 7-8, ECF No. 146) Accordingly, this Court finds that the delay in seeking the superseding indictment was reasonable, and further finds that the Defendant's new speedy trial clock has yet to begin to run because other co-defendants in this matter have yet to appear before the Court.[5]

Second, the Defendant has failed to show that his Due Process rights were violated by

---

[5] Even if the Defendant's speedy trial clock had not reset, this Court agrees with the Government's calculations showing that only 63 days of the Defendant's original speedy trial clock have passed due to the significant number of motions filed and the fact that the case was recently under interlocutory appeal. (See Supplemental Response 4, ECF No. 146)

bringing a superseding indictment against him. "[T]he Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." United States v. Marion, 404 U.S. 307, 324 (1971). "This is a heavy burden because it requires not only that a defendant show actual prejudice, as opposed to mere speculative prejudice, but also that he show that any actual prejudice was substantial – that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected." Jones v. Angelone, 94 F.3d 900, 907 (4th Cir. 1996). In this matter, the Defendant has failed to allege any evidence at all tending to show that the Government, by seeking a superseding indictment, acted intentionally to gain a tactical advantage but has merely offered his own speculation based on the timing of a plea agreement deadline. The Defendant has also failed to provide any evidence showing that he has been meaningfully impaired in his defense by any delay in seeking the superseding indictment. In contrast, the Government has alleged specific facts showing that it was forced to bring charges earlier than anticipated because of the actions of some of the co-defendants and that the Government was not prepared to bring all of the charges in this matter until the June Grand Jury session. Accordingly, this Court finds no Due Process violation in the Government's decision to seek a superseding indictment in this case.

Third, the Defendant's Sixth Amendment right to a speedy trial has not been violated because he has not been prejudiced in his ability to defend himself. The Sixth Amendment right to a speedy trial does not per se prejudice the accused's ability to defend himself. Barker v. Wingo, 407 U.S. 514, 521 (1972). In assessing whether or not a Defendant's speedy trial right has been

violated, the Court must weigh the conduct of both the prosecution and the Defendant according to four factors: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.  Barker v. Wingo, 407 U.S. 514, 530 (1972).  Where a superseding indictment adds, in good faith, new defendants and charges, and the defendant fails to allege specific prejudice due to the delay, there is no constitutional violation in how the Government handled the superseding indictment.  United States v. Shealey, 641 F.3d 627, 634 (4th Cir. 2011).  This Court finds that the Barker v. Wingo factors weigh in favor of the Government in this matter.  The length of delay is relatively short at only 49 days, well within the speedy trial time limit assuming no exclusions are made from the speedy trial clock, and the purpose of that delay is adequately explained by the Government – emergency circumstances forced the Government to seek abbreviated charges against the Defendant earlier than expected, and the earliest time that the full circumstances could be presented for indictment was the June Grand Jury session.  The Defendant has asserted his right to a speedy trial in this matter, but he has, as noted supra, failed to allege any specific facts showing prejudice due to the delay.  Accordingly, this Court finds no Sixth Amendment violation in delaying the indictment in this case.

## **RECOMMENDATION AND CONCLUSION**

For the reasons articulated above, I find that the Defendant's Motion to Suppress (ECF No. 114) and Motion to Dismiss (ECF No. 115) should be **DENIED**.  Because trial in this case is set to commence on August 23, 2011, **IT IS ORDERED** that any party aggrieved by this Report and Recommendation shall file specific, written objections with the Clerk of Court on or before **12:00**

**noon on August 16, 2011**.[6]  Any response to any such objection shall be filed by **12:00 noon on August 17, 2011**.  The party should clearly identify the portions of the Report and Recommendation to which the party is filing an objection and the basis for such objection. The party shall also submit a copy of any objections to the Hon. John Preston Bailey, United States District Judge.  Failure to timely file objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Report and Recommendation. 28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **12th day of August, 2011.**

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE

---

[6] Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum – not a minimum – time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require.  United States v. Barney, 568 F.2d 134, 136 (9th Cir. 1978).  Shortening the response period in this case is appropriate because the Defendant's Motions were filed close to the trial date.